CIVIL ACTION NO. 11-404-DLB-CJS

GENE PARKS                                                                                    PLAINTIFF


vs.                              MEMORANDUM OPINION AND ORDER


UPS SUPPLY CHAIN SOLUTIONS, INC.                                              DEFENDANT

*********************

## I.     Introduction

This matter is before the Court on UPS' motion for summary judgment on Gene Parks' employment discrimination claims under the Family and Medical Leave Act, the Kentucky Civil Rights Act and Kentucky common law (Doc. # 28).  In its motion, UPS argues that Parks failed to establish a prima facie case of FMLA interference or retaliation because he did not demonstrate that there was a causal connection between his use of FMLA leave and his termination.  Second, UPS asserts that Parks failed to establish a prima facie case of disability discrimination under the Kentucky Civil Rights Act.  Third, Defendant argues that the FMLA preempts Plaintiff's claim for wrongful discharge in violation of public policy.  The Court has removal jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1441, and 1446.

## II.     Factual and Procedural Background

In February 1999, Defendant UPS Supply Chain Solutions, Inc. (hereinafter "UPS") hired Plaintiff Gene Parks (hereinafter "Parks") to work at its Hebron campus.  (Doc. # 32

at 61).  As a material handler assigned to UPS' Honeywell account, Parks' job duties included driving a forklift, moving boxes, picking products and controlling inventory.  (*Id.* at 62-68).  Supervisor TJ Lovelace (hereinafter "Lovelace") characterized Parks as an "average" employee who sometimes worked diligently throughout his shift and sometimes slacked off.  (Doc. # 29-1 at 16).  Although Lovelace did not recall having any specific problems with Parks when he worked on the Honeywell account, the record indicates that Parks' work was not always accurate.  (Docs. # 32 through 38).  Between 2002 and 2009, Parks' supervisors filled out fifteen SCS Discrepancy Forms detailing his errors in pallet building, putaway and labeling.  (*Id.*).

While assigned to the Honeywell account, Parks took a leave of absence on several occasions.  (Doc. # 32 at 84).  In late 2003, Parks requested time off to recover from an allergic reaction and a blood clot.  (*Id.* at 84; Docs. # 35-3 and 35-4).  Parks also took leave in July 2003 and November 2004 to deal with complications from a shoulder injury that he sustained in a car accident a few years earlier.  (*Id.*; Docs. # 35-2 and 35-6).  In June 2004, January 2005 and February 2006, UPS gave Parks more time off to care for his ailing wife, who suffers from a heart condition.  (*Id.* at 85; Docs. # 35-5, 32-6 and 32-7).  By Parks' own admission, UPS never interfered with him taking leave on these occasions.  (*Id.* at 91).

In 2009, UPS transferred Parks to the new Birkenstock account, where he continued to work as a material handler under the supervision of Khris Jacobs (hereinafter "Jacobs") and Jennifer Valdez (hereinafter "Valdez").  (*Id.* at 62).  Around this time, Parks began experiencing severe neck pain.  (Doc. # 32-9).  When his pain persisted, Parks applied for FMLA certification from UPS' Human Resources Department.  (Doc. # 32-10).  In accordance with company policy, Parks asked his physician to complete the necessary

paperwork, then submitted it to a Human Resources Representative. (Docs. # 30-1 at 17 and 33 at 11). On February 1, 2010, Parks was approved for FMLA intermittent leave, which allowed him to take up to twelve weeks of leave per year to cope with flare-ups or receive medical treatment. (Doc. # 32-10). Parks' supervisors, aware of his certification, gave him time off for a series of cortisone injections and repeatedly told him to go home when he began experiencing flare-ups on the job. (Docs. # 31-5, 31-7 and 32-19). However, Parks' paperwork indicated that he was capable of performing all essential job functions in between flare-ups. (*Id.*).

UPS' "progressive discipline policy" is designed to address a variety of employee infractions, including sub-par performance, safety violations, misconduct, rule violations, tardiness and insubordination. (Doc. # 28-2 at 1). Supervisors typically issue informal "verbal warnings" to first time offenders, then resort to first, second, third and final written warnings for subsequent infractions. (*Id.*; Doc. # 29-1 at 28). Termination is the final step in the disciplinary process. (Doc. # 29-1 at 29). Management has discretion to deviate from this process and proceed straight to a final written warning or termination if the employee's conduct is severe enough to warrant such action. (Doc. # 31-1 at 62). These warnings "roll off" the employee's record after a given amount of time, usually one year, and do not carry over from one type of infraction to another. (Docs. # 29-1 at 35-36 and 31-1 at 52, 92).[1]

---

[1] If, for example, an employee commits a second performance error, he would receive a first warning for performance. (Doc. # 31-1 at 92). A pre-existing first written warning for safety would not impact the employee's first written warning for performance. (*Id.*) That employee would have two first written warnings, one for safety and one for performance, not one second written warning. (*Id.*). Termination usually results when an employee receives a final written warning in one area. (*Id.*). Accordingly, an employee will not usually be terminated for having a

In May 2010, Valdez and Jacobs issued Parks a verbal warning for failure to meet standard productivity goals (hereinafter "MARs") in either replenishment or picking. (Doc. # 31-7). Valdez also noted that Parks had a record of poor quality in receiving. (*Id.*). Parks attributed his errors to a medical condition that adversely affected his concentration, quality and performance. (*Id.*). Human Resources Representative Julie Welch (hereinafter "Welch"), also present during this conversation, informed Parks that his current FMLA paperwork only authorized intermittent leave and indicated that he could perform all essential job functions between flare-ups. (*Id.*). When Parks admitted that he had asked his doctor not to label him as disabled because he feared losing his job, Welch urged Parks to update his FMLA paperwork for his own safety and that of other employees. (*Id.*). Although Welch admitted that she could not guarantee Parks a job if he updated his paperwork, she promised that he would not be treated any differently because of a disability. (*Id.*). She further explained that Parks "has to either get updated FMLA paperwork that lists specific job duties that he is unable to perform or be held accountable at the current production levels (MARS)." (*Id.*).

A few days later, Parks received a first written warning for low MARs in picking. (Doc. # 32-18). He immediately e-mailed Human Resources Supervisor Jennie Davis and informed her that he intended to submit updated FMLA paperwork reflecting his physical limitations. (*Id.*). Parks also expressed concern that he was "being rushed out the door" because this write up "was a week or so later after the first write up." (*Id.*). He felt "backed into a corner" because he often felt able to work, and did not want to use his intermittent

_____

total of four written warnings for different infractions. (*Id.*).

leave on those occasions, but feared that he would get written up if his performance was "less than 120%." (*Id.*).

That same day, Parks asked Valdez for advice about his situation. (Doc. # 32-19). Valdez felt that Parks was "fishing for an answer" and wanted her to either tell him to go home or allow him to continue to work with excuses. (*Id.*). She refused to do either, explaining to Parks that he needed to "be safe and follow his doctor's orders" because he would receive no accommodations until the updated paperwork was processed. (*Id.*). Human Resources later received and approved the updated FMLA paperwork, which reflected Parks' limited ability to drive a forklift, bend, stoop and lift. (Doc. # 32-11).

In August 2010, Lovelace replaced Jacobs as a supervisor on the Birkenstock account. (Doc. # 29-1 at 8). Shortly thereafter, Lovelace and Valdez began using a random audit system to review employee performance. (Docs. # 29-1 at 64-72 and 31-1 at 40, 72-104). When either supervisor had some spare time, they would consult their record of past audits and select an employee whose work had not been reviewed recently. (Docs. # 29-1 at 65 and 31-1 at 30). Usually they would audit this employee by checking a small percentage of the boxes he put away that day, but they occasionally planted errors for the employee to find instead. (*Id.*). Sometimes they also asked material handlers to audit an entire aisle of the warehouse. (*Id.*; Doc. # 29-1 at 66).

In addition to this auditing process, Lovelace and Valdez regularly reviewed production reports, which include a list of boxes that were not logged into the computer system that day. (Docs. # 31-1 at 30 and # 30-1 at 15). When a material handler puts a box away at a physical location in the warehouse, that location must be recorded in the computer system so pickers can easily retrieve that package for later shipment. (*Id.*). If

the computer system is inaccurate, reflecting either no physical location or an incorrect physical location, then the pickers must search throughout the warehouse until they find the product. (*Id.*). This time-consuming process has an adverse impact on overall productivity. (*Id.*). The pickers' efficiency is similarly impaired when the material handler puts a box away upside down because they cannot quickly read and scan the label on the boxes. (*Id.*).

Over the next few months, Lovelace and Valdez disciplined Parks several times for such errors. (Docs. # 32-23, 32-24, and 32-29). In December 2010, Parks received his first written performance warning because he put cartons away physically but recorded an incorrect location in the computer system. (Doc. # 32-23). One month later, an audit revealed that Parks had physically put away four boxes in receiving but failed to enter their location in the computer system. (Doc. # 32-24). Lovelace and Valdez issued a second written performance warning for this error. (*Id.*). In May 2011, Parks received his third written performance warning for putting six boxes away upside down. (Doc. # 32-29). All three warnings indicated that Parks would face further discipline or termination if he did not improve his quality while meeting his productivity goals. (*Id.*).

One week later, Parks earned a final written performance warning for putting seven boxes away upside down. (Doc. # 31-19). According to Lovelace and Valdez, Parks' boxes were the only ones out of those audited that were upside down. (*Id.*). When Parks found out about this final warning, he approached Lovelace and Valdez individually and explained that he simply was not as fast as he used to be due to his medical condition. (Doc. # 31-6). Both supervisors informed Parks that FMLA only covers missed time, not performance at work, and recommended that he submit new FMLA paperwork if he felt that

6

he could not do his job.  (*Id.*).

Parks also had a record of safety violations, equipment handling errors and behavioral issues while working on the Birkenstock account.[2]  (Docs. # 29 at 11 and 31-9).  Although his supervisors made notes about each incident, it appears that Parks was only disciplined for two infractions.  (*Id.*).  The first took place in Fall 2010, shortly after the news broke that UPS had lost the Honeywell account to an underbidder and planned to close the facility.  (Doc. # 29-1 at 14).  Parks went to the Honeywell building and badgered those employees about the loss of the account and their potential unemployment.  (Doc. # 31-13).  Parks maintained that he was trying to reach out to his former co-workers, but many of the employees were offended by his remarks.  (Doc. # 32 at 154-56).  Due to the severity of Parks' actions, Valdez issued him a final conduct/behavior warning.  (*Id.*).  Valdez disciplined Parks again in April 2011, when she caught him driving down an aisle backwards.  (Doc. # 31-17).  He received his "only warning" for this safety violation.  (*Id.*).

As Parks' disciplinary file at UPS grew thicker, so did his medical records.  In early 2010, Parks' family doctor, Dr. Gary Melton (hereinafter "Dr. Melton"), prescribed a three month course of physical therapy to strengthen Parks' muscles.  (Docs. # 32 at 20-22, 99-103 and 32-13).  However, the physical therapy did not alleviate the pain, so Dr. Melton

---

[2]  The record reflects that Parks drove a stock picker into a bay in April 2010.  (Doc. # 29 at 11-13).  He claimed that the machine's guide wire malfunctioned, a complaint that had been voiced by other equipment drivers as well, but the equipment maintenance company found nothing wrong with the stock picker.  (*Id.*).  Two weeks later, Parks committed another unspecified equipment violation.  (Doc. # 31-10).  UPS documents also show that fellow employees complained about Parks' handling of heavy equipment, because he refused to slow down and almost ran over another employee.  (Docs. # 31-12 and 31-10).  These incidents did not cause any personal injury or property damage.  On a behavioral note, Parks was once involved in an altercation with a security guard because he refused to comply with UPS policy and take out his wallet before entering the building.  (Doc. # 31-16).

referred Parks to the Mayfield Clinic, where he received cortisone shots on a regular basis. (*Id.*).  When this course of treatment proved ineffective, Parks returned to Dr. Melton to discuss his remaining options.  (Doc. # 32 at 123).  Dr. Melton referred Parks to the CAST Institute, which specializes in spinal injuries.  (Doc. # 32 at 21).  After performing a series of MRIs and x-rays, Dr. Nael Shanti (hereinafter "Dr. Shanti") determined that Parks was probably suffering from a degenerative disc condition.  (*Id.*).

When Parks had to leave work early for doctor's appointments or other treatment, he always informed Lovelace and Valdez.  (Docs. # 32 at 45-47 and 29 at 48).  Parks also notified his supervisors when it became likely that he would need surgery.  (*Id.*).  His last FMLA certification, submitted in January 2011, also indicated that Parks would likely undergo surgery in the future, at which time he would require continuous leave to recover from the procedure.  (Doc. # 32-10).  In the mean time, Parks inquired about temporarily working as a floor picker, but there were no available positions.  (Doc. # 32 at 45-47).  Parks also did not want to operate an older-model cherry picker because its jerky movements aggravated his neck condition, but he continued to do so because he was one of the few employees certified to operate heavy equipment.  (*Id.*).

In late May, Parks had his second appointment with Dr. Shanti, who confirmed that surgery would be necessary in the near future.  (Docs. # 32 at 18-19, 23 and 32-14).  Parks went to work as usual that week, but left early on Friday due to a flare-up.  (Doc. # 32 at 23).  When he got home, Parks had a voicemail from Dr. Shanti, explaining that his surgery had been scheduled for June 16, 2011.  (*Id.* at 24).  Parks alleges that he told his supervisors about his scheduled surgery at the beginning of his shift the following week.  (*Id.* at 25-26).  However, Lovelace and Valdez do not recall discussing Parks' scheduled

surgery that morning. (Docs. # 31-1 at 24-25 and 29-1 at 46-51). They maintain that they were only aware of his general need for surgery at some point in the future. (*Id.*).

That same day, Valdez discovered that Parks had put a container away in the correct location physically, but logged it in at an incorrect location in the computer system. (Docs. # 31-1 at 22-28 and 31-19). He had also failed to record another container's location in the computer system. (*Id.*). E-mails indicate that Valdez initially intended to issue Parks a written warning, but she realized that he was already on a final written warning for both performance and conduct/behavior. (Doc. # 31-19). After conferring with Lovelace, Valdez contacted Welch to recommend that Parks' employment be terminated. (*Id.*). Welch forwarded this recommendation to her superior, Human Resources Manager Michelle Chavez (hereinafter "Chavez"), who approved the decision to terminate.[3] (*Id.*). Chavez made the decision solely based on his performance history. (Doc. # 28-3). In fact, the documents she reviewed made no mention of Parks' FMLA certification. (*Id.*).

Valdez, Lovelace and Welch met with Parks towards the end of his shift and told him that his employment had been terminated. (Docs. # 29-1 at 48-49, 31-1 at 83-85 and 30-1 at 12). All three recalled that Parks was very upset with the decision. (*Id.*). He repeatedly asked them "How can you do this to me?" and requested that they continue to employ him until he had his surgery so he could receive benefits. (*Id.*). They refused. (*Id.*). Welch gave Parks an information packet about COBRA, but he threw it away because he felt COBRA was too expensive. (Doc. # 32 at 27-28).

---

[3] Valdez sent courtesy copies of this correspondence to campus director Tony Migliozzi and facility manager Scott Reinhart, but these men played no role in the decision-making process. (Docs. # 29-1 at 34 and 31-19).

Parks alleges that Lovelace behaved in a hostile manner towards FMLA certified employees. (Doc. # 33 at 24-27). According to Parks, Lovelace often insinuated that those employees were just trying to game the system. (*Id.*). Pallet builder Joe Chrisman, formerly employed on the Honeywell account, also heard Lovelace, co-supervisor Joe Feuser, and Human Resources personnel make derogatory comments about FMLA leave. (Doc. # 43-4 at 3). However, Parks and Chrisman do not recall these individuals directing negative comments at them. (*Id.*; Doc. # 33 at 24-27).

Parks also believes that UPS' "progressive discipline policy" allows for disparate and inconsistent treatment of employees. (Doc. # 42 at 24). He argues that Brenda Kinman and Kevin Wiley received more favorable treatment than he did, even though they were all similarly situated. However, these employees were disciplined for different matters. (Doc. # 31-1 at 122). Kinman and Wiley were put on Performance Improvement Plans (hereinafter "PIPs") to increase their productivity, which was only an occasional problem for Parks. (*Id.* at 100). UPS typically uses additional training, rather than PIPs, to address quality concerns. (*Id.* at 96). Since Parks consistently had a problem with quality rather than performance, he was offered additional training each time he received a warning. (*Id.* at 97). However, he failed to take advantage of these improvement opportunities. (*Id.*).

According to Parks, Cathy Harms also received more favorable treatment because she was not discharged despite the fact that she committed seventeen quality-related errors in a month. (Doc. # 42 at 24). However, Harms received one warning for eight errors committed on the same day and another warning for a set of nine errors. (Doc. # 31-1 at 122). Each of Parks' warnings corresponded to multiple errors committed simultaneously, which is consistent with Harms' treatment. (Docs. # 32-21, 32-24 and 32-

10

29).  Harms also accepted retraining on each of these occasions.  (Doc. # 31-1 at 122).

Finally, Parks maintains that a disproportionate number of errors were attributed to him because the UPS system is flawed.  (Doc. # 32 at 28).  While the computer system shows which employee scanned each box in, Parks points out that the system has no way of identifying another employee's subsequent errors.  (*Id.*).  For example, an employee could put a box in the correct location, scan it properly, and drive away.  (*Id.*).  However, another employee could later move the box to an incorrect location.  (*Id.*).  When questioned about certain errors that he made on the Honeywell account, Parks offered a similar explanation.  (*Id.* at 192).  He excused himself from other errors by noting that several people got "hammered" for the same thing.  (*Id.* at 193).

Without his UPS benefits, Parks was unable to afford the spinal surgery.  (*Id.* at 73).  He is still living with the degenerative herniated disc condition, which imposes significant limitations on his daily activities.  (*Id.*).  However, he hopes to receive benefits from his current employer, an AT&T subcontractor, in the near future.  (Doc. # 33 at 54-55*,* 56-57).

### III.  Analysis

#### 1.  Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment

by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250.

## 2. Plaintiff's FMLA Claim

Under the Family and Medical Leave Act, an employee who suffers from "a serious health condition that makes [him or her] unable to perform the function of the position" may take up to twelve weeks of leave per year. 29 U.S.C. § 2612(a)(1)(D). The Act prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided by [the Act]." 29 U.S.C. § 2615(a)(1). It is also unlawful for employers to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." 29 U.S.C. § 2615(a)(2). Employers who violate these provisions of the Act may be held liable to the employee for damages and other equitable relief. 29 U.S.C. § 2617(a)(1).

## A. Analytic Framework for FMLA Claims

The Sixth Circuit recognizes two distinct theories of recovery under the Family and Medical Leave Act. *Arban v. West Publishing Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). The interference theory, arising out of § 2615(a)(1), allows recovery for any interference with the FMLA-created right to medical leave, regardless of the employer's intent. *Id.* By contrast, the key inquiry under the retaliation theory, derived from § 2615(a)(2), is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012)(*quoting Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)). Although a "claim for retaliatory discharge is cognizable under either theory, the requisite

proofs differ." *Id.*

Despite the distinction between these two theories of recovery, a plaintiff's failure to specify which theory he is advancing is not necessarily fatal to his claim. *See Morris v. Family Dollar Stores of Ohio*, 320 Fed. App. 330, 335-36 (6th Cir. 2009)(reversing the district court's finding that the plaintiff waived a claim based on the interference theory because he did not specify which theory he sought to use); *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 446 (6th Cir. 2007)(finding it appropriate to analyze the plaintiff's claim under both theories of recovery because the complaint alleged broad FMLA violations that could encompass one or both theories).

However, courts may also consolidate a plaintiff's FMLA claim if it sounds in one theory of recovery only. *See Seeger*, 681 F.3d at 282. In *Seeger*, the plaintiff predicated his retaliatory discharge claim on both theories, but this Court determined that the plaintiff's claim essentially sounded in retaliation theory and analyzed his claim accordingly. *Id.* This Court ultimately granted the defendant's motion for summary judgment and the plaintiff appealed, arguing that this Court improperly consolidated his FMLA claims. *Id.* The Sixth Circuit affirmed this Court's decision, reasoning that the plaintiff's claim was fundamentally one for retaliation, not interference, because his employer "did not shortchange his leave time, deny reinstatement, or otherwise interfere with his substantive FMLA rights." *Id.* at 283.

In this case, Defendant urges the Court to adopt the same approach it used in *Seeger* and analyze Plaintiff's FMLA claim under the retaliation theory only. Defendant indicates that consolidation is appropriate because, although Plaintiff's FMLA claim invokes both theories of recovery, Plaintiff does not specify how Defendant's actions constituted

13

interference. Instead, Plaintiff simply alleges that Defendant terminated his employment after he notified his supervisors of his intent to take FMLA leave. Based on its reading of the Complaint, Defendant concludes that Plaintiff's claim sounds in the retaliation theory only. Although not stated in such explicit terms, Defendant also suggests that Plaintiff received all of the FMLA leave that he was entitled to, and therefore cannot proceed under the interference theory, because he testified in his deposition that Defendant certified all of his prior requests for FMLA leave.

Instead of opposing Defendant's request, Plaintiff's Response focuses solely on the retaliation theory. Despite this lack of argument, the Court is not inclined to pare down Plaintiff's FMLA claim because the facts of this case are not sufficiently analogous to those presented in *Seeger*. While it is clear that Defendant granted Plaintiff's leave requests in the past, there is a factual dispute as to whether Plaintiff informed his supervisors of his scheduled surgery on the morning of his termination. Plaintiff insists that he informed his supervisors, Lovelace and Valdez, that his surgery had been scheduled on May 31, 2011. Because he allegedly notified them at the beginning of his shift, Plaintiff surmises that his supervisors, Lovelace and Valdez, began corresponding about his termination afterwards. Although both supervisors were aware that Plaintiff would likely undergo surgery at some point in the future, at which time he would require continuous leave to recover from the procedure, neither recalled having any discussion with Plaintiff about the scheduled surgery that morning.

As discussed above, a claim for wrongful discharge is cognizable under either theory of recovery. Although courts will not treat a plaintiff's allegations of general § 2615 violations as a waiver of one theory, neither will courts allow plaintiffs to advance both

14

theories of recovery without supporting facts. While Plaintiff's complaint is quite general in substance, it provides enough information for Plaintiff to proceed under both theories. Specifically, the factual dispute as to whether Plaintiff notified his supervisors of his intent to take leave for his scheduled surgery suggests possible interference with FMLA's substantive rights. Accordingly, the Court will reject Defendant's argument and analyze Plaintiff's FMLA claim under both theories of recovery.

### B.    Interference Theory

A claim for interference with the FMLA's substantive rights requires proof of the following five elements: 1.) Plaintiff was an eligible employee; 2.) Defendant is a covered employer; 3.) Plaintiff was entitled to leave under the FMLA; 4.) Plaintiff gave Defendant notice of his intent to take leave; and 5.) Defendant denied Plaintiff his FMLA benefits or interfered with FMLA rights to which he was entitled. *Hoge v. Honda of America Mfg, Inc.,* 384 F.3d 238, 244 (6th Cir. 2004). If the defendant claims that the plaintiff would have been discharged regardless of his use of FMLA leave, then the plaintiff must also, "in the course of establishing the right [protected by § 2615(a)(1)], convince the trier of fact that the evidence submitted by employer is insufficient and that the employee would not have been discharged if he had not taken FMLA leave." *Arban v. West Publishing Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).

"[T]he critical test for substantively sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Brenneman v. MedCentral Health System*, 366 F.3d 412, 421 (6th Cir. 2004). Sixth Circuit case law suggests that an employee may satisfy this test by

15

verbally notifying his supervisor of his need for leave. *See Treadaway v. Big Red Powersports, LLC*, 611 F. Supp. 2d 768, 780 (E.D.T.N. March 12, 2009)(finding that the reasonable notice prong was satisfied because the plaintiff told her supervisor that she would need leave until her employer took adequate precautions to address her medical concerns and attempted to give him supporting documentation); *Curry v. Goodwill Industries of Kentucky, Inc.*, Civ. A. No. 1:11CV-00093-JHM, 2013 WL 1411132 at *6 (W.D.K.Y. Apr. 8, 2013)(concluding that plaintiff gave reasonable notice by informing her supervisor of her need for leave prior to filing a formal request for leave a month in advance of her scheduled surgery). The employee need not mention the FMLA as the source of his right to request such leave. *Brenneman*, 366 F.3d at 421.

If it is not clear from the record whether the employee gave such notice, then there exists a factual dispute sufficient to preclude summary judgment on the interference claim. In *Hoge*, Plaintiff sued her employer for interference with her substantive FMLA rights. *See* 384 F.3d at 238. Specifically, she complained that her employer failed to immediately restore her to the position she had occupied prior to surgery. *Id.* at 244. Although it was clear that her employer approved her request for leave to recuperate from abdominal surgery, "the record d[id] not establish her new return date and the parties dispute[d] whether Honda had reason to expect her return on the morning of June 27." *Id.* at 248. The Court denied the employer's summary judgment motion, reasoning that these discrepancies in the record created a genuine issue of material fact as to whether the plaintiff provided the defendant with reasonable notice that the plaintiff would be returning from leave sooner than expected. *Id.*

As in *Hoge*, the record in this case does not clearly establish whether Plaintiff gave reasonable notice of his intent to take leave in June. Lovelace and Valdez admit that they were aware of Plaintiff's need for surgery in the future, as evidenced by numerous e-mails referencing his condition. However, neither supervisor remembers discussing Plaintiff's scheduled surgery with him on the morning of his termination. Plaintiff recalls just the opposite. He alleges that he found out about his scheduled surgery after leaving work on Friday and notified his supervisors at the beginning of his shift the following week. However, there is no record of this alleged dialogue, nor are there any other documents indicating that Plaintiff notified his supervisors. For example, Plaintiff did not submit any formal written notice of his intent to take leave in June. E-mails exchanged between Lovelace and Valdez that day make no mention of his scheduled surgery, focusing solely on his sub-par work performance. Because there is no evidence of this conversation, apart from the parties' conflicting deposition testimony, there is a genuine issue of material fact as to whether Plaintiff notified his supervisors of his scheduled surgery on May 31, 2011. Accordingly, the Court finds that summary judgment on Plaintiff's FMLA interference claim is inappropriate.

### C. Retaliation Theory

A claim for FMLA retaliation requires proof of the following five elements: 1.) Plaintiff was engaged in a statutorily protected activity; 2.) Defendant knew that he was exercising his FMLA rights; 3.) Plaintiff suffered an adverse employment action; and 4.) A causal connection existed between the protected FMLA activity and the adverse employment action. *Seeger,* 681 F.3d at 283. To establish a prima facie case of retaliation, plaintiff must put forth some credible evidence that enables the court to deduce that there is a

causal connection between the retaliatory action and the protected activity. *Id.* If sufficient evidence is presented, a presumption of discrimination arises. *Id.* Courts have held that close temporal proximity between FMLA leave and termination may be sufficient to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge. *See id.* at 283 (finding that the timing did meet the threshold of proof because "Seeger's termination followed on the heels of CBT's investigation, which commenced during Seeger's FMLA leave").

If the plaintiff succeeds in creating a presumption of discrimination, the *McDonnell Douglas* burden shifting scheme becomes applicable. *Id.* Accordingly, the defendant has the opportunity to rebut that presumption by articulating a legitimate, non-discriminatory reason for discharging the plaintiff. *Id.* Courts have held that "[p]oor performance is a legitimate, non-discriminatory reason for terminating a person's employment" and is sufficient to satisfy the defendant's initial burden under the *McDonnell-Douglas* framework. *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 546 (6th Cir. 2008).

Once the defendant has rebutted the presumption of discrimination, the burden shifts back to the plaintiff, who must produce adequate evidence demonstrating that the defendant's proffered reason was a pretext for discrimination. *Seeger*, 681 F.3d at 285. The proffered reason cannot be a pretext for discrimination unless it is shown that the reason was false *and* that discrimination was the real reason. *Id.* A plaintiff may establish pretext by showing that the employer's proffered reasons have no basis in fact, did not actually motivate the action or were insufficient to warrant the action. *Id.* While temporal proximity was sufficient to establish a prima facie case of discrimination, it cannot be the sole basis for finding pretext. *Id.* Timing can still be a "strong indicator of discrimination,

but it must be accompanied by some other, independent evidence." *Id.*

In this case, Plaintiff attempts to establish pretext using the "cat's paw" theory of liability, which holds an employer liable "when a biased intermediate employee's actions are 'a causal factor in the ultimate employment action' such that the animus of the intermediate employee can be attributed to the employer." *Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1191 (2011). "Cat's paw" liability will not attach unless the employee's discriminatory animus is "a motivating factor in the employer's action." *Grant v. Walgreen Co.*, No. 10-11392, 2011 WL 2079923 at *8 (E.D.M.I. May 25, 2011). To establish that discriminatory animus was a motivating factor, the plaintiff must do more than simply allege that the intermediate employee made discriminatory comments or favored other employees. *Id.* at *10 (finding that supervisor's discriminatory comments about age "do not raise an issue that [supervisor] targeted Plaintiff and used Plaintiff's age as a reason to terminate her"). A motivating factor exists when the employee who made the adverse employment decision acted out of personal hostility to the employee's protected status. *See Staub*, 131 S.Ct. at 1196 (finding that Staub's supervisor manifested a discriminatory animus directly related to his participation in the Army Reserves by scheduling him for additional shifts without notice "so that he would pay back the department for everyone else having to bend over backwards to cover his schedule for the Reserves" and asking a co-worker to help her get rid of him because his "military duty has been a strain on the department").

Defendant argues that summary judgment is appropriate on Plaintiff's FMLA retaliation claim because he cannot establish a causal connection between his attempt to take leave and his termination. Specifically, Defendant argues that timing alone is not

enough to establish such a causal connection. However, this Court, and others within the Sixth Circuit, have previously held that timing alone is enough to satisfy the low threshold of proof required to state a prima facie case. In this case, Plaintiff testified that he left work early on Friday, May 27, 2011, due to a flare-up. When he returned to work the next week, he stated that he immediately notified his supervisors of his intent to take FMLA leave in June, explaining that his surgery had finally been scheduled. His employment was terminated a few hours later. The Court finds that the very short period of time between Plaintiff's request for leave and his termination is sufficient to establish a prima facie case of FMLA retaliation. Therefore, a presumption of discrimination arises and the burden shifts to Defendant rebut this presumption.

Defendant maintains that Plaintiff was discharged for poor performance, which the law recognizes as a legitimate, non-discriminatory reason for termination. To support this assertion, Defendant has produced thorough documentation of Plaintiff's performance issues at UPS. Plaintiff received multiple written warnings for his sub-par performance, all of which indicated that he could face termination if his work did not improve. Despite this admonition, Plaintiff declined additional training opportunities. Although Plaintiff's errors became more frequent as his neck condition worsened, Lovelace, Valdez and Welch repeatedly told him that, while his FMLA paperwork authorized time off to cope with his condition, it did not excuse poor performance. As long as Plaintiff chose to work, he would have to meet the standards expected of all employees. If Plaintiff felt that he could not do so, then he needed to update his paperwork again. Defendant has not only demonstrated that Plaintiff had consistent performance issues, it has shown that Plaintiff failed to heed warnings or take advantage of opportunities for improvement, knowing full well that

termination could result from continued errors. Therefore, the Court finds that Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff, thus shifting the burden back to Plaintiff.

Plaintiff argues that Defendant's reason is pretextual by once again emphasizing the timing of his termination. However, the law is clear that timing alone cannot establish pretext, so Plaintiff attempts to show that Defendant's stated reason did not actually motivate its termination decision. Plaintiff alleges that Lovelace manifested a discriminatory animus against him by making derogatory comments about employee use of FMLA. Ultimately, Plaintiff argues that this discriminatory animus motivated the termination decision, and therefore, this animus should be attributed to Defendant for liability purposes. However, Plaintiff only produces evidence that Lovelace was not fond of FMLA policies and sometimes spoke negatively about them. There is no indication that such comments were ever specifically directed at him or any other employee. In short, this case cannot be properly compared to *Staub* because there is no evidence in the record that Lovelace targeted Plaintiff for his use of FMLA leave.

Plaintiff also attempts to establish pretext with a weak allegation that he was treated differently than other, similarly situated employees. However, a closer examination of the examples cited by Plaintiff actually suggests that the opposite is true. Plaintiff takes issue with the fact that other employees were put on Performance Improvement Plans, which UPS uses to remedy productivity problems. Since Plaintiff had consistent quality issues, he was offered additional training, but declined it each time. Plaintiff also complains that an employee named Cathy Harms was not terminated for committing seventeen errors in one month, which is more than he committed. However, Harms committed nine quality

errors on one occasion and eight on another. She received one warning for each set of errors and accepted retraining each time. Plaintiff overlooks the fact that he was given the exact same treatment. He was issued one warning for each set of errors and offered retraining. Therefore, there is no evidence that Plaintiff was treated differently than other similarly situated employees. Having concluded that Plaintiff has not met his burden of demonstrating that Defendant's reason for termination was pretextual, the Court finds that summary judgment on Plaintiff's FMLA retaliation claim is appropriate.

### 3. Plaintiff's ADA/KCRA Claim

The Americans with Disabilities Act prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[4]  42 U.S.C. § 12112. An employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" constitutes discrimination as defined in the statute. *Id.*

To state a claim of disability discrimination for failure to accommodate, a plaintiff must demonstrate that following elements: 1.) Plaintiff is disabled within the meaning of the Act; 2.) Plaintiff is otherwise qualified for the position with or without reasonable accommodation; 3.) Defendant knew or had reason to know about Plaintiff's disability; 4.)

---

[4]  The Kentucky Civil Rights Act provides the same protections as the Americans with Disabilities Act, so courts use the federal framework to analyze claims under the state statute. *Compare* 42 U.S.C. § 12112 *with* Ky. Rev. Stat. Ann. § 344.010, et seq.; *see Bryson v. Regis Corp.*, 498 F.3d 561, 754 (6th Cir. 2007); *Hallahan v. Courier-Journal,* 138 S.W.3d 699, 706-07 (Ky. Ct. App. 2004).

Plaintiff requested an accommodation; and 5.) Defendant failed to provide the necessary accommodation.[5]  *See Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007).   To satisfy the fourth element, the plaintiff must have initially proposed an accommodation that is objectively reasonable.  *Brown v. Humana Ins. Co.*, 942 F. Supp. 2d 723, 732 (W.D.K.Y. Apr. 30, 2013).  The Sixth Circuit has recognized that a medical leave of absence can constitute a reasonable accommodation under appropriate circumstances.  *See Cehr v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775 (6th Cir. 1998)(holding that there was a genuine issue of material fact as to whether an eight-week leave of absence, followed by a request for more leave, was a reasonable accommodation).   *But see Walsh v. United Parcel Serv.*, 201 F.3d 718, (6th Cir. 2000)(holding that a year of paid disability leave, followed by a request for six months of unpaid leave, was not reasonable under the circumstances).

The briefing indicates that there is considerable confusion as to the substance of Plaintiff's ADA/KCRA claim. Defendant's Motion for Summary Judgment suggests that Plaintiff is claiming disability discrimination based on wrongful discharge as well as failure to accommodate.  However, a close reading of the Complaint reveals that Plaintiff's claim is based solely on alleged failure to accommodate.[6]  This distinction is critical because claims based on failure to accommodate necessarily require direct evidence, while claims based on wrongful discharge often involve indirect evidence, thus triggering the *McConnell*

---

[5]  For purposes of this Motion, Defendant does not dispute that Plaintiff is disabled.

[6]  The Complaint states that "Defendant discriminated against Plaintiff on the basis of his disability *by failing to provide reasonable accommodation* to his disability, including, but not limited to, the refusal to allow him medical leave to seek medical care for his medical condition." (Doc. # 1-1 at 5 (emphasis added)).

*Douglas* burden shifting scheme. *See Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007). Proceeding under the assumption that Plaintiff is claiming discrimination based on wrongful discharge, Defendant argues that Plaintiff's claim must fail because he cannot prove that he was terminated solely because of his disability. However, the Court will disregard this portion of Defendant's argument because it is irrelevant to Plaintiff's failure to accommodate claim.

In briefing the failure to accommodate issue, Defendant improperly characterizes the proposed accommodation as a request "to delay Plaintiff's termination until after his surgery." (Doc. # 28 at 14). Defendant then states that it had no duty to continue to employ Plaintiff until after his surgery, nor did it have a duty to accommodate Plaintiff after his termination. (*Id.*). Plaintiff responds that the requested accommodation was a leave of absence for surgery, *not* delayed termination. (Doc. # 42 at 28). The Court will take this clarification into account. It should also be noted that, while the Complaint alludes to other instances of Defendant's failure to accommodate, Plaintiff only cites Defendant's refusal to grant Plaintiff's request for medical leave. Accordingly, the Court will confine its analysis to this one specific allegation of failure to accommodate.

Plaintiff maintains that he requested an accommodation, in the form of medical leave to undergo surgery, when he allegedly spoke to Lovelace and Valdez on May 31, 2011. It is therefore necessary to revisit the factual dispute that lies at the heart of Plaintiff's FMLA interference claim: whether Plaintiff spoke with his supervisors about medical leave on the morning of his termination. Because neither the record nor the parties' deposition testimony clearly establishes that this conversation took place, there is a genuine dispute of material fact as to whether Plaintiff requested an accommodation. Accordingly, the

Court finds that summary judgment on Plaintiff's ADA/KCRA claim is inappropriate.

### 4. Plaintiff's Public Policy Claim

Kentucky is an employment at will state. *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1984). Although the Kentucky Supreme Court has created an exception for wrongful terminations that are in violation of public policy, this exception is only applicable when the statute creating the public policy exception does not provide a structure for pursuing a claim. *Grzyb v. Evans*, 700 S.W.2d 399, 402 (Ky. 1985). If the statute that establishes the public policy exception also creates a statutory cause of action for, and structures the remedy for, violations of that public policy, then the statute preempts the common law wrongful discharge claim. *Lines v. Elf Atochem North America, Inc.*, 813 F. Supp. 550, 552 (W.D.K.Y. Feb. 4, 1993); *Hill v. Kentucky Lottery Corp.*, 327 S.W.3d 412, 421 (Ky. 2010).

Applying these rules, several courts have held that wrongful discharge claims based on the Family Medical Leave Act and the Kentucky Civil Rights Act were pre-empted. *See Grzyb*, 700 S.W.2d at 402 (holding that the Kentucky Civil Rights Act "not only creates the public policy but preempts the field of its application"); *Barber v. Humana*, Civ. A. 3:10-CV-25-H, 2010 WL 2106659 at *3 (W.D.K.Y. May 24, 2010)(holding that Plaintiff's cause of action for wrongful discharge in violation of public policy was pre-empted and subsumed by the Kentucky Civil Rights Act claims); *Franklin v. Greenheck Fan Corp.*, Civ. A. 04-13-JMH, 2005 WL 1657047 at *6 (E.D.K.Y. July 8, 2005)(concluding that Plaintiff's common law wrongful discharge claim could not withstand summary judgment because the Plaintiff sought to base that claim on Family and Medical Leave Act violations); *Broadway v. Sypris Technologies, Inc.*, Civ. A. 3:09-CV-976, 2011 WL 847064 at * 4 (W.D.K.Y. March 9,

2011)(deciding that wrongful discharge claim should not go forward because "the only well-defined public policy mentioned anywhere in the pleadings are the Kentucky workers compensation statutes, the Family and Medical Leave Act, and the Kentucky Civil Rights Act, all of which provide their own causes of action and remedies").

Plaintiff claims that Defendant wrongfully discharged him in violation of public policy. Although the pleadings are not particularly clear on this point, Plaintiff's claim seems to be based on public policies set out in the Family and Medical Leave Act. However, it is well-settled that this Act preempts common law wrongful discharge claims because it provides its own cause of action and remedy for the same public policy violations. Therefore, Defendant is entitled summary judgment on this claim.

## IV.    Conclusion

For the reasons stated above, **IT IS ORDERED** as follows:

1.    Defendant's Motion for Summary Judgment (Doc. # 28) is **GRANTED** with regard to Plaintiff's claims for FMLA retaliation and common law wrongful discharge, and **DENIED** with respect to Plaintiff's claims for FMLA interference and ADA/KCRA failure to accommodate;

2.    This matter is set for a **Status Conference** on **Thursday, February 27, 2014 at 11:30 a.m. in Covington**. The parties shall be prepared to set this matter for trial during the conference.

This 4th day of February, 2014.



Signed By:
*David L. Bunning*
United States District Judge